14 CV          2211

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AG Funds, L.P., AG MM, L.P., AG Super Fund International, L.P., AG Princess, L.P., Nutmeg Partners, L.P., AG Super Fund, L.P., Aristeia Horizons, L.P., Windermere Ireland Fund plc, Compass ESMA, L.P., Compass TSMA, L.P., Xeropolis LLC, OZ ELS Master Fund, Ltd., OZ Master Fund, Ltd., OZ Eureka Fund, L.P., Gordel Capital Limited, Goldman Sachs Profit Sharing Master Trust, OZ Europe Master Fund, Ltd., OZ Global Special Investments Master Fund, L.P., OZ Select Master Fund, Ltd., Merrill Lynch Investment Solutions - Och-Ziff European Multi-Strategy UCITS Fund, OZ Global Equity Opportunities Master Fund, Ltd., OZ Enhanced Master Fund, Ltd., OZEA, L.P., Sapelo LLC, Whitebox Concentrated Convertible Arbitrage Partners, LP, Whitebox Credit Arbitrage Partners, LP, Whitebox Asymmetric Partners, LP, Whitebox Multi-Strategy Partners, LP, Pandora Select Partners, LP, Whitebox Institutional Partners, LP, Whitebox Special Opportunities Fund Series B Partners, LP, and Whitebox Special Opportunities Fund LP - Series O, | Civil Action No.: <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** <br><br>  |
| Plaintiffs, | |
| v. | |
| Sanofi, Genzyme Corporation, Christopher Viehbacher, David Meeker, and Jerome Contamine, | |
| Defendants. | |

Plaintiffs AG Funds, L.P., AG MM, L.P., AG Super Fund International, L.P.,

AG Princess, L.P., Nutmeg Partners, L.P., AG Super Fund, L.P., Aristeia Horizons,

L.P., Windermere Ireland Fund plc, Compass ESMA, L.P., Compass TSMA, L.P.,

Xeropolis LLC, OZ ELS Master Fund, Ltd., OZ Master Fund, Ltd., OZ Eureka Fund, L.P., Gordel Capital Limited, Goldman Sachs Profit Sharing Master Trust, OZ Europe Master Fund, Ltd., OZ Global Special Investments Master Fund, L.P., OZ Select Master Fund, Ltd., Merrill Lynch Investment Solutions - Och-Ziff European Multi-Strategy UCITS Fund, OZ Global Equity Opportunities Master Fund, Ltd., OZ Enhanced Master Fund, Ltd., OZEA, L.P., Sapelo LLC, Whitebox Concentrated Convertible Arbitrage Partners, LP, Whitebox Credit Arbitrage Partners, LP, Whitebox Asymmetric Partners, LP, Whitebox Multi-Strategy Partners, LP, Pandora Select Partners, LP, Whitebox Institutional Partners, LP, Whitebox Special Opportunities Fund Series B Partners, LP, and Whitebox Special Opportunities Fund LP - Series O, severally, by their attorneys, Ross & Orenstein LLC, for their collective Complaint against Defendants Sanofi, Genzyme Corporation, Christopher Viehbacher, David Meeker, and Jerome Contamine ("Defendants") allege, as more particularly set forth below:

## I. INTRODUCTION

1.     For nine years, the U.S. Food and Drug Administration ("FDA") told drug manufacturer Genzyme Corporation ("Genzyme") and its successor, Sanofi, that the clinical testing for its "Lemtrada" product was fatally flawed. The product was ostensibly designed to treat multiple sclerosis. The FDA repeatedly and explicitly warned Genzyme and Sanofi that without double-blind testing, FDA approval was unlikely at best, but Genzyme and Sanofi continued to conduct trials that were not double-blind.

2.     At the same time, for the latter two and one-half of those years, Genzyme and Sanofi repeatedly and explicitly told the investing public that Lemtrada was highly likely to receive FDA approval, without disclosing that their communications from the FDA were telling them the contrary.   Specifically, Genzyme and Sanofi made strongly encouraging and materially misleading statements in connection with Sanofi's issuance of contingent value rights ("CVRs") when it acquired Genzyme in March and April 2011.   The CVRs provided for payments to investors that depended directly on Lemtrada meeting certain benchmarks, including a payment upon FDA approval.   That approval, according to offering materials from Genzyme and Sanofi, was approximately 90% likely.

3.     On November 8, 2013, in advance of a hearing on Lemtrada, the FDA released its briefing materials, in which the full history of the FDA's negative communications to Genzyme and Sanofi was revealed.   The market reacted with understandable shock.   The CVRs, which were publicly traded on the NASDAQ exchange, fell from $2.00 to $0.77 a share, a loss in value of over 62%.

4.     On December 30, 2013, Sanofi announced that the FDA had denied its approval for Lemtrada, on the basis of failure to conduct "adequate and well-controlled studies."   The CVRs dropped precipitously again.

5.     Incredibly, in a January 23, 2014 television interview, Sanofi's CEO said that the FDA's rejection of Lemtrada "was actually something that wasn't a total surprise."   Unfortunately, it *was* a total surprise to investors, because Genzyme and Sanofi had never disclosed anything other than a forecast that flew in

3

the face of facts that only Genzyme and Sanofi knew.  In particular, the rejection by the FDA was a total surprise to the Plaintiffs in this action, purchasers of more than 80 million shares of the CVRs, or approximately 35% of the amount outstanding.   The Plaintiffs made their purchases in direct reliance on the Defendants' materially misleading public statements.

6.    The Plaintiffs, in short, were defrauded by Genzyme, Sanofi and the named officers and directors, all of whom made material misrepresentations and omissions in violation the Securities Act of 1933 (the "'33 Act" or "Securities Act") and the Securities Exchange Act of 1934 (the "'34 Act" or "Exchange Act"), as well as applicable state laws.  Plaintiffs' damages as a result of Defendants' fraud are in the tens of millions of dollars.

## II. PARTIES

### A. Plaintiffs

7.    Plaintiffs AG Funds, L.P., AG MM, L.P., AG Super Fund International, L.P., AG Princess, L.P., Nutmeg Partners, L.P., and AG Super Fund, L.P. (collectively, "AG") are managed by Angelo Gordon & Company, LP, an investment advisor, with its principal place of business in New York City. AG held more than 3 million shares of the CVRs on November 8, 2013.

8.    Plaintiffs Aristeia Horizons, L.P., Windermere Ireland Fund plc, Compass ESMA, L.P., and Compass TSMA, L.P. (collectively, "Aristeia") are managed by Aristeia Capital LLC, an investment advisor with its principal place of business in New York City. Aristeia held more than 5 million shares of the CVRs on

November 8, 2013.

9.     Plaintiff Xeropolis LLC ("Xeropolis") has been validly assigned all right, title and interest in all legal claims and causes of action concerning investments in the CVRs by nine investment funds (collectively, the "Xeropolis Funds"). The Xeropolis Funds are managed by a single investment advisor with its principal place of business in Santa Monica, California. The Xeropolis Funds held more than 16 million shares of the CVRs on November 8, 2013.

10.     Plaintiffs OZ ELS Master Fund, Ltd., OZ Master Fund, Ltd., OZ Eureka Fund, L.P., Gordel Capital Limited, Goldman Sachs Profit Sharing Master Trust, OZ Europe Master Fund, Ltd., OZ Global Special Investments Master Fund, L.P., OZ Select Master Fund, Ltd., Merrill Lynch Investment Solutions - Och-Ziff European Multi-Strategy UCITS Fund, OZ Global Equity Opportunities Master Fund, Ltd., OZ Enhanced Master Fund, Ltd., and OZEA, L.P. (collectively, "OZ") are managed by OZ Management LP, an investment advisor, with its principal place of business in New York City. OZ held more than 11 million shares of the CVRs on November 8, 2013.

11.     Plaintiff Sapelo LLC ("Sapelo") has been validly assigned all right, title and interest in all legal claims and causes of action concerning investments in the CVRs by four investment funds (collectively, the "Sapelo Funds"). The Sapelo Funds are managed by a single investment advisor with its principal place of business in Boston, Massachussetts. The Sapelo Funds held more than 31 million shares of the CVRs on November 8, 2013.

12.     Plaintiffs Whitebox Concentrated Convertible Arbitrage Partners, LP, Whitebox Credit Arbitrage Partners, LP, Whitebox Asymmetric Partners, LP, Whitebox Multi-Strategy Partners, LP, Pandora Select Partners, LP, Whitebox Institutional Partners, LP, Whitebox Special Opportunities Fund Series B Partners, LP, and Whitebox Special Opportunities Fund LP - Series O (collectively, "Whitebox") are managed by Whitebox Advisors LLC, an investment advisor with its principal place of business in Minneapolis, Minnesota. Whitebox held more than 16 million shares of the CVRs on November 8, 2013.

13.     Plaintiffs AG and Whitebox received shares of the CVRs directly from Sanofi in 2011 in exchange for shares of Genzyme, and are referred to herein as the "Offering Plaintiffs."

B. Defendants

14.     Defendant Sanofi is incorporated under the laws of France as a *société anonyme*, a form of limited liability company, with its principal place of business in Paris, France.

15.     Defendant Genzyme Corporation ("Genzyme") is a wholly-owned subsidiary of Sanofi, with its principal place of business in Cambridge, Massachussetts.

16.     Defendant Christopher Viehbacher ("Viehbacher") was, at all relevant times, the chief executive officer ("CEO") of Sanofi and the chairman of Genzyme.

17.     Defendant David Meeker ("Meeker") was, at all relevant times, the President and CEO of Genzyme.

18.     Defendant Jerome Contamine ("Contamine") was, at all relevant times, Sanofi's Executive Vice President and Chief Financial Officer ("CFO"). Viehbacher, Meeker, and Contamine are referred to herein as the "Individual Defendants."

## III.    JURISDICTION AND VENUE

19.     This Court has jurisdiction over the subject matter of this action under Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

20.     Venue is proper in this District under Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c) and (d). Many of the acts and transactions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material facts, occurred in this District and the CVRs are traded in this District.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Sanofi issues the CVRs in order to acquire Genzyme.

21.     Sanofi is a global pharmaceutical group engaged in the research, development, manufacturing, and marketing of healthcare products. The CVRs were issued in 2011 as part of Sanofi's (then known as sanofi-aventis) acquisition of Genzyme.

22.     In 2010, Sanofi began making vigorous private and public overtures regarding a purchase of Genzyme, and Genzyme rebuffed Sanofi's efforts with

statements that Lemtrada's potential justified a higher purchase price than what Sanofi was offering. Specifically:

      a.    In a letter on August 11, 2010, Genzyme rejected Sanofi's "opportunistic takeover proposal" citing "the potential of our new product pipeline, in particular the outlook for our MS treatment Alemtuzumab."

      b.    In a letter dated August 30, 2010, Genzyme stated that it had provided Sanofi with "very useful, non-public information regarding … the tremendous upside of our multiple sclerosis drug alemtuzumab."

      c.    In a letter dated November 8, 2010, Genzyme noted that it "has provided the marketplace with … detailed information about our near-term plans and future prospects, including the results of an independent third party study of alemtuzumab's revenue potential," but Sanofi "has chosen to dismiss or ignore this information and stick to its opportunistic and inadequate" offer.

23.    As Sanofi's efforts continued in late 2010, Genzyme attempted to convince its investors and analysts that its business prospects were undervalued by the markets, and in particular, to persuade investors and analysts that Lemtrada's business potential was not accurately reflected in its stock price, or in the offers made by Sanofi. These efforts included (1) an October 22, 2010 meeting in New York with investors and analysts in which Genzyme communicated its expectations about Lemtrada and its rationale for rejecting Sanofi's then-existing offers and (2) a December 20, 2010 investor briefing about the market potential of Lemtrada, including detailed information from Dr. Edward Fox of the University of Texas, who provided information about Lemtrada's clinical trials.

24.    Beginning in November 2010, Genzyme and Sanofi's financial advisors began discussing the possibility of issuing a contingent value right to Genzyme's shareholders as part of an acquisition by Sanofi, in order to resolve any differences

of opinion between the two sides regarding Lemtrada's future value. By January 2011, these discussions had evolved into concrete proposals reflected in draft legal agreements exchanged between the parties.

25.     On February 15, 2011, Sanofi and Genzyme agreed to terms on a comprehensive merger agreement (the "Merger Agreement"), which was executed by both parties after midnight on February 16, 2011, and announced that morning prior to the opening of trading on the NASDAQ (where Genzyme's shares were trading at the time).

26.     Under the Merger Agreement, Sanofi increased its prior offers to Genzyme's shareholders. In exchange for each Genzyme share, Sanofi agreed to offer $74 in cash, plus one contingent value right, which gave the holder the right to receive certain payments if certain regulatory and sales milestones were reached regarding Lemtrada. As explained in a Q&A document released by Sanofi and Genzyme and included in SEC filings:

> The CVR contains 5 discrete milestones related to the development and commercialization of Lemtrada:
> 1)     Approval Milestone: CVR holders are entitled to receive $1 per CVR after U.S. FDA approval of Lemtrada for treatment of multiple sclerosis, if the approval occurs on or before March 31, 2014.
> 2)     Product Sales Milestone #1: CVR holders are entitled to receive $2 per CVR in the event net sales for Lemtrada total $400 million or more on a global basis during specified periods following product launch.
> 3)     Product Sales Milestone #2: CVR holders are entitled to receive $3 per CVR in the event global net sales for Lemtrada total $1.8 billion during any 4 consecutive calendar quarters. Any quarters used in the achievement of this sales milestone cannot be used again for the achievement of any subsequent milestones. In addition, if this Product Sales

Milestone #2 is achieved despite U.S. FDA approval of Lemtrada for treatment of multiple sclerosis not having occurred on or before March 31, 2014 (and so the Approval Milestone Payment was not made), CVR holders will be entitled to receive an additional $1 per CVR for Product Sales Milestone #2.

    4)    Product Sales Milestone #3: CVR holders are entitled to receive $4 per CVR in the event global net sales for Lemtrada total $2.3 billion during any 4 consecutive calendar quarters. Any quarters used in the achievement of this sales milestone cannot be used again for the achievement of any subsequent milestones.

    5)    Product Sales Milestone #4: CVR holders are entitled to receive $3 per CVR in the event global net sales for Lemtrada total $2.8 billion during any 4 consecutive calendar quarters.

27.    Each CVR thus entitled its holder to payments of up to $13 per share if all five Lemtrada milestones were reached.

28.    The CVRs also contained a possible $1 per share payout if certain production milestones were met in 2011 for two other drugs. (These milestones were not met.) Thus, the value of the CVRs was based primarily on the regulatory and sales prospects of Lemtrada.

29.    Upon signing the Merger Agreement, both Sanofi and Genzyme made public statements in order to persuade Genzyme's shareholders to accept Sanofi's offer to purchase the outstanding Genzyme stock. In particular, Genzyme released its claimed management projections on the likelihood that the CVR milestones would be reached as part of a Schedule 14D-9 filing it made with the SEC on March 7, 2011 (the "Genzyme 14D-9"). (Incredibly, while Genzyme claimed that it was not releasing these projections "to influence a [Genzyme] shareholder's decision

whether to" accept Sanofi's offer, it included these projections in a document prepared explicitly for that purpose).

30.   The Genzyme 14D-9 stated that Genzyme's management was very optimistic that Lemtrada would reach the Approval Milestone (requiring FDA approval by March 31, 2014), ascribing a *90% likelihood* to achievement of that milestone. Genzyme also claimed that it believed there was an 80% likelihood it would reach Product Sales Milestone #1, a 54% likelihood it would reach Product Sales Milestone #2, and a 50% likelihood it would reach Product Sales Milestone #3. Based on these projections, Genzyme calculated an "Illustrative Midpoint Probability-Adjusted Intrinsic Value" for each share of the CVRs of $5.58, as of March 2011.

31.   Although Genzyme's projections were accompanied with boilerplate caveats, Genzyme did not disclose any specific facts it possessed (such as negative feedback it had received from the FDA) that contradicted its rosy regulatory approval projection.

32.   On March 30, 2011, Sanofi and the American Stock Transfer & Trust Company, LLC, as trustee, entered into a CVR agreement governing the terms of the CVRs, and the CVRs began trading publicly on March 31, 2011.

33.   Sanofi's purchase of Genzyme (the "Acquisition") was completed on April 8, 2011 through the purchase of more than 90% of Genzyme's stock pursuant to Sanofi's exchange offer, followed by a short-form merger.

B. Defendants conceal the repeated negative feedback received from the FDA about Lemtrada's approval prospects and clinical trials.

34.    From the initial issuance of the CVRs, Sanofi and Genzyme misled investors about the value of the CVRs, in particular by making false and misleading statements and omissions about the prospects for FDA approval of Lemtrada. As noted above, on March 7, 2011, Genzyme assigned a 90% probability to Lemtrada receiving FDA approval, without mentioning any negative feedback it had received from the FDA about Lemtrada's prospects of approval.

35.    Contrary to its fair weather public assessments of FDA approval, by early 2011, Genzyme had received several explicit warnings from the FDA that it considered the Lemtrada clinical trials to be fundamentally flawed because Genzyme was not performing double-blind studies. This repeated negative feedback from the FDA, which contradicted Genzyme's rosy projections of FDA approval, was plainly known to Genzyme (and, after the Acquisition, Sanofi), but was *never disclosed* to the public until it was summarized in briefing materials released by the FDA on November 8, 2013, in advance of a November 13, 2013 hearing (the "November '13 Briefing Materials").

36.    According to the November '13 Briefing Materials, the FDA told Genzyme on several occasions from 2005 until early 2011 that it had fundamental concerns with the structure of the Lemtrada clinical trials, and expressed doubt that Lemtrada could receive FDA approval as a result of those concerns. In particular:

a.    On November 7, 2002, the FDA had a teleconference with ILEX (acquired by Genzyme in 2004) to discuss an early proposed Lemtrada study (CAMMS223). The minutes of that teleconference note that the FDA

informed Ilex that "[d]ue to the clinical trial design, the results of this study will not provide substantial support for a BLA," a Biologics License Application for approval by the FDA. Further, the FDA minutes note that, already in 2002, "[t]he sponsor acknowledged that this study will not provide substantial support for a BLA" (emphasis in original).

   b.    On August 13, 2004, the FDA in another teleconference with ILEX (months before it was acquired by Genzyme), again informed them that "[b]ecause of study design issues (open-label, small sample size) the [CAMMS223 trial] is unlikely to provide substantial support for an sBLA."

   c.    On April 1, 2005, in a call with Genzyme, the FDA reiterated that because CAMMS223 was "moderately sized and open label" it "will not be a pivotal study to support a license application" (emphasis in original).

   d.    In September 2005, the FDA put a clinical hold on Lemtrada, and following three unsuccessful responses from Genzyme, the FDA met with Genzyme on November 21, 2006, in which the FDA informed Genzyme that "[i]n the absence of a valid justification for the proposed study, we believe that any further investigation of alemtuzumab for multiple sclerosis should be carried out under a well designed randomized controlled trial that will provide useful efficacy data as well as adequate safety monitoring. The current trial (CAMMS223) does not meet these criteria."

   e.    In March 2007, Genzyme submitted two protocols for two further trials (CAMMS323 and CAMMS324) and the FDA responded in a letter on June 29, 2007. In that letter, the FDA stated that it "strongly recommends that you use a double-blind placebo control in your pivotal trial."

   f.    On March 17, 2010, in a meeting with Genzyme, the FDA told Genzyme (according the FDA's meeting minutes) that it "was concerned by the potential bias introduced by the absence of blinding of patients." According to the minutes, "[b]linding procedures were discussed in detail" and the FDA stated that "the bias introduced by unblinding of physicians and patients remains a significant problem which will cause serious difficulties in interpreting the results of the trial."

   g.    On January 24, 2011 (only six weeks before Genzyme publicly stated that it had a 90% likelihood of achieving FDA approval by March 2014) the FDA again reiterated its unaddressed concerns with the structure of the Lemtrada trials:

   Beginning with our initial review of the CAMMS323 and
   CAMMS324 protocols, *the lack of double-blinding has*

13

> *consistently concerned us. The lack of blinding remains a
> major concern.* We [FDA] note that, *despite these
> previous concerns that have been communicated to you,
> there was little discussion of the unblinded design of the
> trials in the meeting material.* We emphasize the
> importance of presenting a full discussion and analysis of
> the impact of having the patients and treating physicians
> unblinded. [Emphasis added.]

37.    All of this negative feedback, material information necessary to make Genzyme's statements about Lemtrada not misleading, was concealed by Genzyme and Sanofi until it was revealed by the FDA in November 2013.

**C. Sanofi issues the CVRs based on false and misleading offering documents.**

38.    Sanofi issued the CVRs in a series of exchanges with Genzyme shareholders (including the Offering Plaintiffs) beginning with an April 1, 2011 tender offer and concluding with a short-form merger on April 8, 2011 (the "Offering"). The Offering was conducted pursuant to a Form F-4 Registration Statement (Registration No. 333-174638) first filed on March 7, 2011 (and amended on March 18, March 24, and March 28, 2011), and a 424B3 Prospecture filed on March 30, 2011 (together, the "Offering Materials").

39.    The Offering Materials incorporated by reference the Genzyme 14D-9, stating that "[f]or more information about the recommendation of the Genzyme Board and the reasons for its recommendation, please see Genzyme's Solicitation/Recommendation Statement on Schedule 14D/9-A which is being mailed to Genzyme shareholders together with this Prospectus/Offer to Exchange and is incorporated herein by reference."

14

40.     As noted above, the Genzyme 14D-9 stated that Genzyme's management believed it was *90% likely* to achieve the Approval Milestone. In addition, it stated, "The Approval Milestone is designed to trigger a payment to CVR holders in the event that the Company receives FDA approval of alemtuzumab for treatment of MS by March 31, 2014. *Company management currently anticipates product approval in the United States in the second half of 2012*." (emphasis added). These statements about the prospects of FDA approval were not accompanied by any mention of the concerns the FDA had expressed about Lemtrada's approval prospects.

41.     In addition, the Offering Materials incorporated by reference several other SEC filings containing material misstatements and omissions, including Genzyme's Annual Report on Form 10-K for the year ended December 31, 2010 (the "2010 10-K"), Genzyme's January 11, 2011 filing on Form 8-K (the "1/11/11 8-K"), Genzyme's February 16, 2011 filing on Form 8-K (the "2/16/11 8-K").

42.     The 2010 10-K stated that

> Alemtuzumab.    We are developing alemtuzumab for the treatment of MS, a chronic and debilitating disease in which the body's immune system attacks the central nervous system. Alemtuzumab is a humanized monoclonal antibody that binds to a specific target on certain immune system cells, resulting in the depletion of these cells while allowing the immune system to reconstitute itself. It is estimated that there are approximately 2.1 million MS patients worldwide. Worldwide sales of MS therapies exceeded $10.0 billion in 2009 and are expected to be $13.0 billion by 2012, driven by anticipated growth in the number of MS patients under treatment, price increases of current therapies and future therapies. Despite advances in the management of MS, there remains an unmet medical need for therapies with greater efficacy and improved convenience. We

believe alemtuzumab's mechanism of action is fundamentally
different from current MS treatments and its anticipated once-
yearly dosing regimen would be more convenient than the
dosing regimens of many existing therapies that require
frequent, and in some cases daily, injections.

We are currently developing alemtuzumab for the treatment of
Relapsing-Remitting MS, or RRMS, the most common form of
MS. Approximately 85% of patients with MS will have RRMS,
with some of these patients later developing more severe forms
of the disease. We have completed enrollment in two phase 3
clinical trials of alemtuzumab vs. Rebif® (a standard of care
therapy) for the treatment of RRMS, from which we expect to
obtain results in 2011. Five-year follow up data from our phase 2
study continues to show durable treatment benefit. In 2010, the
FDA granted alemtuzumab "fast track" status for the treatment
of RRMS. *We anticipate product approval in the United States
in the second half of 2012.* [Emphasis added.]

These misleading statements about the Lemtrada trial results and prospects of

FDA approval were not accompanied by any mention of the concerns the FDA had

expressed about the trials or Lemtrada's approval prospects.

43.    The 1/11/11 8-K included a press release by Genzyme stating that

Within Genzyme's late-stage product pipeline, three product
approvals are expected by the end of 2013 [including]
alemtuzumab for multiple sclerosis....

Based on promising phase 2 data, alemtuzumab has the
potential to become a new standard of care for multiple sclerosis
treatment, a market that is expected to reach $14 billion by
2012. Two phase 3 trials are fully enrolled; results of the trial in
treatment-naïve patients are expected mid-year, and results of
the trial in treatment-experienced patients are expected during
the second half of this year. *Genzyme anticipates U.S. approval
of the treatment in 2012.* [Emphasis added.]

16

These misleading statements about the Lemtrada trial results and prospects of FDA approval were not accompanied by any mention of the concerns the FDA had expressed about the trials or Lemtrada's approval prospects.

44. The 2/16/11 8-K included a press release by Genzyme stating that "Based on promising phase 2 data, alemtuzumab has the potential to become a new standard of care for multiple sclerosis treatment, a market that is expected to reach $13 billion by 2012. Two phase 3 trials are fully enrolled; results of the trial in treatment-naïve patients are expected mid-year, and results of the trial in treatment-experienced patients are expected during the second half of this year. *Genzyme anticipates U.S. approval of the treatment in the second half of 2012.*" (emphasis added). These misleading statements about the Lemtrada trial results and prospects of FDA approval were not accompanied by any mention of the concerns the FDA had expressed about the trials or Lemtrada's approval prospects.

**D. Defendants' continuing misstatements and omissions regarding Lemtrada trials and FDA approval.**

45. Following the Acquisition, Sanofi continued to make false and misleading statements to the marketplace about Lemtrada's FDA approval process and status, without disclosing the FDA's repeated concerns.

46. On November 14, 2011, in a Form 6-K filing with the SEC and accompanying press release, Sanofi announced "Successful Phase III Results for Alemtuzumab (LEMTRADA™) in Multiple Sclerosis." Meeker was quoted as saying: "We are very pleased with the results of the CARE-MS II study which are unprecedented . . . Based on these positive results, we are on track to submit

17

LEMTRADA™ for review to US and EU regulatory authorities in the first quarter of 2012." These misleading statements about the Lemtrada trial results and prospects of FDA approval were not accompanied by any mention of the concerns the FDA had expressed about the trials or Lemtrada's approval prospects.

47.   On March 6, 2012, Sanofi filed its annual report on Form 20-F with the SEC, which stated:

> Alemtuzumab (Lemtrada™) — . . . The two Phase III studies demonstrating the safety and efficacy of alemtuzumab were completed in 2011. The first study, CARE-MS I, demonstrated strong and robust treatment effect on the relapse rate co-primary endpoint vs Rebif. The co-primary endpoint of disability progression (time to sustained accumulation of disability SAD) did not meet statistical significance. The second study, CARE-MS II, demonstrated that relapse rate and SAD were significantly reduced in MS patients receiving alemtuzumab as compared with Rebif. In both cases, safety results were consistent with previous alemtuzumab use in MS and adverse events continued to be manageable. The dossier is scheduled to be submitted to FDA review in the second quarter of 2012.

These statements about the Lemtrada trial results and prospects of FDA approval were not accompanied by any mention of the concerns the FDA had expressed about the trials or Lemtrada's approval prospects.

48.   On April 25, 2012, in a Form 6-K filing with the SEC and accompanying press release (dated April 24, 2012), Sanofi announced "Significant Improvement in Disability Scores Observed in Multiple Sclerosis Patients Who Received Lemtrada™ (Alemtuzumab) Compared With Rebif® in Phase III Trial," and stated that "[t]he company is on track to file for U.S. and EU approval of alemtuzumab in relapsing MS in the second quarter of 2012." These misleading

statements about the Lemtrada trial results and prospects of FDA approval were not accompanied by any mention of the concerns the FDA had expressed about the trials or Lemtrada's approval prospects.

49.   On June 12, 2012, in a Form 6-K filing with the SEC and accompanying press release, Sanofi announced that it had submitted a supplemental Biologics License Application ("sBLA") to the FDA, as well as an application for European regulatory approval. In that press release, Sanofi stated:

> Genzyme's clinical development program for LEMTRADA included two Phase III studies in which results for LEMTRADA were superior to Rebif® (high dose subcutaneous interferon beta-1a) on clinical and imaging endpoints, including a reduction in relapse rate. In addition, as presented last month at the American Academy of Neurology meeting, some patients with pre-existing disability treated with LEMTRADA in the CARE-MS II trial were more than twice as likely to experience a sustained reduction in disability over two years than patients treated with Rebif.
>
> \*          \*          \*
>
> The regulatory submissions for LEMTRADA include two-year controlled efficacy and safety data from both treatment-naïve patients and those who relapsed while on therapy, with greater than five years of safety follow-up. Common adverse events associated with alemtuzumab were consistent across the Phase III program and included infusion-associated reactions and infections, which were generally mild to moderate in severity. Autoimmune adverse events were observed in some patients with cases being detected early through a monitoring program and managed using conventional therapies.

These misleading statements about the Lemtrada trial results and the FDA application were not accompanied by any mention of the concerns the FDA had expressed about the trials or Lemtrada's approval prospects.

50.    On January 29, 2013, Sanofi filed a Form 6-K with the SEC containing a press release dated January 28, 2013 announcing that the FDA "has accepted for review the company's supplemental Biologics License Application (sBLA) file seeking approval of LEMTRADA™ (alemtuzumab) for the treatment of relapsing multiple sclerosis."   The press release stated that "[t]he LEMTRADA clinical development program includes CARE-MS I and CARE-MS II (Comparison of Alemtuzumab and Rebif® Efficacy in Multiple Sclerosis), randomized Phase III studies comparing LEMTRADA to a standard of care MS treatment, Rebif, in patients with relapsing-remitting MS who were naïve to prior treatment or who had relapsed while on prior therapy, respectively. Genzyme announced publication of results of these studies in The Lancet in November 2012."   These misleading statements about the Lemtrada trial results and the FDA application were not accompanied by any mention of the concerns the FDA had expressed about the trials or Lemtrada's approval prospects.

51.    On March 7, 2013, Sanofi filed its annual report on Form 20-F with the SEC, which stated:

> The main compound currently in Phase III clinical development in the multiple sclerosis field is Lemtrada™ (alemtuzumab), a humanized monoclonal antibody targeting CD52 antigen abundant on the surface of B and T lymphocytes leading to changes in the circulating lymphocyte pool. Alemtuzumab has been developed to treat patients with relapsing forms of MS. *The two pivotal Phase III studies demonstrating the safety and efficacy of alemtuzumab were completed in 2011* and the results were published in the Lancet in November 2012. The first study, CARE-MS I, demonstrated strong and robust treatment effect on the relapse rate co-primary endpoint vs Rebif in treatment-naive MS patients. The co-primary endpoint of disability

progression (time to sustained accumulation of disability: SAD) did not meet statistical significance. The second study, CARE-MS II, demonstrated that relapse rate and SAD were significantly reduced in MS patients receiving alemtuzumab as compared with Rebif in MS patients who had relapsed on prior therapy. Results from CARE-MS II also showed that patients treated with Lemtrada™ were significantly more likely to experience improvement in disability scores than those treated with Rebif, suggesting a reversal of disability in some patients. In both pivotal studies, safety results were consistent with previous alemtuzumab use in MS and adverse events continued to be manageable. *Marketing applications for Lemtrada™ are currently under review by regulatory authorities.* [Emphasis added.]

These misleading statements about the Lemtrada trial results and the FDA application were not accompanied by any mention of the concerns the FDA had expressed about the trials or Lemtrada's approval prospects.

52.     On March 25, 2013, Sanofi filed a Form 6-K with the SEC containing a press release dated March 21, 2013, entitled "Effect of Genzyme's LEMTRADA Maintained in Patients Beyond Two-Year Pivotal MS Studies." In addition to extensively discussing the results from Sanofi's Lemtrada trials, this press release stated that "Genzyme's applications to market LEMTRADA for the treatment of MS are currently being reviewed by the European Medicines Agency and the U.S. Food and Drug Administration. The company expects action on both applications this year." These misleading statements about the Lemtrada trial results and the FDA application were not accompanied by any mention of the concerns the FDA had expressed about the trials or Lemtrada's approval prospects.

E.   Plaintiffs invest in the CVRs in reliance on Defendants' false and misleading statements.

21

53.    Each of the Plaintiffs conducted extensive research, using publicly available information, prior to investing in the CVRs. In doing so, each of the Plaintiffs reviewed Sanofi and Genzyme's SEC filings and public statements for information regarding Lemtrada's prospects for regulatory approval and sales, and relied on the accuracy of those filings and statements.

54.    None of the Plaintiffs was aware of the strong, repeated negative feedback Genzyme and Sanofi had received from the FDA about the prospects of Lemtrada receiving FDA approval, and Plaintiffs would have considered that information to be material information regarding their decision whether to invest in the CVRs. In ignorance of this concealed information, Plaintiffs purchased the CVRs at artificially inflated prices.

**F.  The truth is revealed and the CVRs plummet.**

55.    On October 16, 2013, the FDA announced that it would be holding a hearing on November 13, 2013 regarding Lemtrada's application. On November 8, 2013, the FDA Advisory Committee on Peripheral and Central Nervous System Drugs released the November '13 Briefing Materials, which revealed publicly for the first time the consistent, repeated warnings from the FDA to Genzyme about the fundamental structural deficiencies of its Lemtrada trials, as set forth above.

56.    The November '13 Briefing Materials included review materials prepared by three doctors, and contained an introductory memorandum summarizing the concerns each of the three reviewing doctors expressed to the FDA thus:

As discussed by Drs. Mentari, Marler, and Yan, significant concerns exist regarding the safety profile of alemtuzumab and the adequacy of the efficacy data. These issues will be the primary focus of the advisory committee meeting.

*Dr. Mentari's review discusses numerous safety concerns associated with the use of alemtuzumab for MS.* These include the incidence of an array of autoimmune diseases including immune thrombocytopenia (ITP), autoimmune hemolytic anemia, immune pancytopenia, anti-glomerular basement membrane (Anti-GBM) disease, membranous glomerulonephritis, thyroid disorders, endocrine ophthalmopathy, acquired hemophilia A, type 1 diabetes mellitus, acute epitheliopathy of the retina, autoimmune skin disease, and undifferentiated connective tissue disorders, along with the incidence of malignancies, notably including thyroid cancer and melanoma. *As these concerns are serious and potentially fatal,* Dr. Mentari does not recommend approval of alemtuzumab unless substantial clinical benefit exists.

Dr. Marler's review discusses various concerns associated with the data presented by the applicant in support of a demonstration of clinical benefit. These stem from issues involved with the adequacy of the design of the primary trials on which the application relies for support. In particular, *Dr. Marler has grave concerns that the failure to blind patients and treating physicians in the open-label design of the trials introduced bias that confounds interpretation of their ostensible results.* Because of these issues, Dr. Marler finds that *the applicant has not submitted evidence from adequate and well-controlled studies to support the effectiveness of alemtuzumab for treating multiple sclerosis.*

Dr. Yan's review discusses the statistical aspects of the data presented by the applicant in support of a demonstration of clinical benefit, and largely reinforces the concerns of Dr. Marler. *Dr. Yan also feels that troublesome design issues and the presence of bias in the trials prevents reliance on their results,* and that a valid, accurate, and interpretable effect on the two main clinical outcomes of interest, relapse rate and sustained accumulation of disability, has not been established. Dr. Yan finds, like Dr. Marler, that *the applicant has not provided evidence from adequate and well-controlled studies in this application* and that such studies still need to be conducted

to establish the effectiveness of alemtuzumab for the treatment of patients with multiple sclerosis. [Emphasis added.]

57.     As a result of these bombshell public disclosures about the design flaws of the Lemtrada trials, the public trading price of the CVRs dropped by more than 62%, from $2.00 per share to close at $0.77 per share at the close of trading on November 8, 2013.

58.     On December 30, 2013, Sanofi issued a press release announcing that it had received a Complete Response Letter from the FDA regarding Lemtrada, in which the FDA denied the Lemtrada sBLA. As noted in that press release,

> FDA has taken the position that Genzyme has not submitted evidence from adequate and well-controlled studies that demonstrate the benefits of Lemtrada outweigh its serious adverse effects. Genzyme understands that the conclusion is related to the design of the completed Phase 3 active comparator studies of Lemtrada in relapsing-remitting MS patients. FDA has also taken the position that one or more additional active comparator clinical trials of different design and execution are needed prior to the approval of Lemtrada.

In that press release, Sanofi also acknowledged publicly for the first time that it "does not anticipate that the CVR milestone of U.S. approval of Lemtrada by March 31, 2014 will be met." Following the FDA's Complete Response Letter, the public trading price of the CVRs dropped further, closing at $0.32 per share on December 30, 2013.

59.     Incredibly, only after the FDA had finally rejected Sanofi's Lemtrada application, Viehbacher said in a January 23, 2014 interview on Bloomberg Television that the FDA's rejection of Lemtrada "was actually something that wasn't a total surprise." Unfortunately, based on the public statements and

24

omissions of Genzyme, its rejection *was* a "total surprise" to Plaintiffs, right up until Defendants' fraud was revealed on November 8, 2013.

60.     As a result of Defendants' fraud and the decline in the trading price of the CVRs when that fraud was revealed, Plaintiffs suffered millions of dollars in damages.

## COUNT ONE
### Section 11 of the '33 Act
### Against Sanofi and Genzyme

61.     The preceding paragraphs of the Complaint are incorporated as if stated fully herein.

62.     As set forth above, the Offering Materials contained untrue statements of material fact and omitted to state other facts required to be stated therein or necessary to make the statements therein not misleading, in particular regarding the Lemtrada trials and the prospects of FDA approval. The misstated and omitted facts would have been material to a reasonable person reviewing the Offering Materials.

63.     Defendants owed to the Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the Offering Materials, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

64.     Defendants did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the Offering Materials, and

did not possess reasonable grounds for believing that the Offering Materials did not contain an untrue statement or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

65.    Defendants did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the Offering Materials and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated. In particular, Defendants did not conduct a reasonable investigation into the accuracy of the statements regarding the Lemtrada trials and the prospects of FDA approval.

66.    Plaintiffs purchased the CVRs issued pursuant or traceable to the Offering Materials, and were damaged thereby.

67.    Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the Offering Materials when they purchased or acquired their securities.

68.    Therefore, Defendants are liable to the Plaintiffs for violations of Section 11 of the '33 Act.

**COUNT TWO**
Section 12(2) of the '33 Act
Against Sanofi

69.    The preceding paragraphs of the Complaint are incorporated as if stated fully herein.

70.    Sanofi is a seller within the meaning of the '33 Act because it

26

transferred title to purchasers of the CVRs in the Offering.

71.     As alleged herein, the Offering Materials contained untrue statements of material fact, and omitted to state other facts required to be stated therein or necessary to make the statements therein not misleading, in particular regarding the Lemtrada trials and the prospects of FDA approval. The misstated and omitted facts would have been material to a reasonable person reviewing the Offering Materials.

72.     Sanofi owed to Offering Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the Offering Materials, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

73.     Sanofi did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the Offering Materials and did not possess reasonable grounds for believing that the Offering Materials did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

74.     The Offering Plaintiffs purchased the CVRs in the Offering, and were damaged thereby.

75.     The Offering Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or

omissions of material facts in the Offering Materials when they purchased or acquired the securities.

76.     Therefore, Sanofi is liable to the Offering Plaintiffs for violations of Section 12(2) of the '33 Act. The Offering Plaintiffs hereby tender their CVRs to Sanofi and seek rescission of their purchases to the extent that they continue to own such securities.

COUNT THREE
Section 10(b) of the '34 Act and Rule 10b-5
Against All Defendants

77.     The preceding paragraphs of the Complaint are incorporated as if stated fully herein.

78.     As alleged herein, Defendants made untrue statements of material fact and omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme, and course of conduct in violation of Section 10(b) of the '34 Act and Rule 10b-5. In particular, each of Sanofi and Genzyme's statements about the results from its Lemtrada trials and prospects for FDA approval were made misleading by its failure to disclose the significant negative feedback it had received from the FDA about the flawed structure of the Lemtrada trials. The Defendants intended to, and did, deceive the investing public, including Plaintiffs, and artificially inflate the prices of the CVRs, causing Plaintiffs to purchase and acquire the CVRs at artificially inflated prices.

79.     The Defendants were individually and collectively responsible for making the material misrepresentations and omissions and engaging in a plan,

28

scheme, and course of conduct designed to deceive Plaintiffs and other Sanofi investors, by virtue of having prepared, approved, signed, and disseminated documents that contained untrue statements of material fact and omitted facts necessary to make the statements therein not misleading.

80.    As set forth above, the Defendants made their false and misleading statements and omissions and engaged in deceptive conduct knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon the Plaintiffs.

81.    In ignorance of the false and misleading nature of the Defendants' statements and omissions, and relying on those statements, Plaintiffs purchased or acquired the CVRs at artificially inflated prices. When the true facts were subsequently disclosed, the prices of the CVRs declined, and Plaintiffs were harmed as a result.

<u>COUNT FOUR</u>
Section 20(a) of the '34 Act
Against the Individual Defendants

82.    The preceding paragraphs of the Complaint are incorporated as if stated fully herein.

83.    The Individual Defendants caused Sanofi and Genzyme to violate Section 10(b) and Rule 10b-5 promulgated thereunder by making material misstatements and omissions in connection with the purchase and sale of securities and by participating in a scheme and course of business or conduct. In particular, each of Sanofi and Genzyme's statements about the results from its Lemtrada trials

and prospects for FDA approval were made misleading by its failure to disclose the significant negative feedback it had received from the FDA about the flawed structure of the Lemtrada trials. This conduct was undertaken with the scienter of the Individual Defendants who knew of or recklessly disregarded the falsity of the Company's statements and the nature of its scheme.

84.    The Individual Defendants were controlling persons of Sanofi and Genzyme during the relevant time period, due to their senior executive positions, direct involvement in its day-to-day operations, financial reporting, and accounting, and signatures on and participation in the preparation and dissemination of its public statements. By virtue of the foregoing, the Individual Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Sanofi and Genzyme, including the content of its financial statements and other public statements.

85.    As set forth above, the Individual Defendants acted knowingly and intentionally, or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiffs.

86.    In ignorance of the false and misleading nature of the Sanofi and Genzyme's statements and omissions, and relying on those statements and omissions, Plaintiffs purchased or acquired the CVRs at artificially inflated prices. But for the material misstatements and omissions, Plaintiffs would not have purchased or acquired the CVRs at artificially inflated prices.

87.     As set forth herein, when the true facts were subsequently disclosed, the prices of the CVRs declined precipitously. Plaintiffs were harmed and damaged as a direct and proximate result of their purchases of the CVRs at artificially inflated prices and the subsequent decline in the prices of those securities when the truth was disclosed.

**COUNT FIVE**
Section 18 of the '34 Act
Against All Defendants

88.     The preceding paragraphs of the Complaint are incorporated as if stated fully herein.

89.     As set forth above, Defendants made (or caused to be made) materially false or misleading statements or omissions in applications, reports, and documents filed pursuant to the '34 Act and the rules and regulations issued thereunder. In particular, each of Sanofi and Genzyme's statements about the results from its Lemtrada trials and prospects for FDA approval were made misleading by its failure to disclose the significant negative feedback it had received from the FDA about the flawed structure of the Lemtrada trials.

90.     Plaintiffs invested in the CVRs in ignorance of the false and misleading nature of Defendant's statements and material omissions, and in actual reliance on the true and accurate nature of the statements made by Defendants in their SEC filings.

91.     Defendants' false and misleading statements and omissions artificially inflated the price at which Plaintiffs' purchased or acquired the CVRs. Plaintiffs'

suffered damages resulting from their reliance on Defendants' statements when the nature of Defendants' fraud was revealed, and the public trading price of the CVRs declined as a result.

**COUNT SIX**
Cal. Corp. Code §§ 25401, 25504,
Against All Defendants

92.     The preceding paragraphs of the Complaint are incorporated as if stated fully herein.

93.     As alleged herein, Defendants made untrue statements of material fact and omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme, and course of conduct in violation of the California Corporate Securities Law. In particular, each of Sanofi and Genzyme's statements about the results from its Lemtrada trials and prospects for FDA approval were made misleading by its failure to disclose the significant negative feedback it had received from the FDA about the flawed structure of the Lemtrada trials. The Defendants intended to, and did, deceive the investing public, including the Xeropolis Funds, and artificially inflate the prices of the CVRs, causing the Xeropolis Funds to purchase and acquire the CVRs at artificially inflated prices.

94.     The Defendants were individually and collectively responsible for making the material misrepresentations and omissions and engaging in a plan, scheme, and course of conduct designed to deceive the Xeropolis Funds and other Sanofi investors, by virtue of having prepared, approved, signed, and disseminated

documents that contained untrue statements of material fact and omitted facts necessary to make the statements therein not misleading.

95. As set forth above, the Defendants made their false and misleading statements and omissions and engaged in deceptive conduct knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon the Xeropolis Funds.

96. In ignorance of the false and misleading nature of the Defendants' statements and omissions, and relying on those statements, the Xeropolis Funds purchased or acquired the CVRs at artificially inflated prices. When the true facts were subsequently disclosed, the prices of the CVRs declined, and the Xeropolis Funds were harmed as a result.

<u>COUNT SEVEN</u>
Minn. Stat. § 80A.76
Against All Defendants

97. The preceding paragraphs of the Complaint are incorporated as if stated fully herein.

98. As alleged herein, Defendants made untrue statements of material fact and omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme, and course of conduct in violation of the Minnesota Securities Act. In particular, each of Sanofi and Genzyme's statements about the results from its Lemtrada trials and prospects for FDA approval were made misleading by its failure to disclose the significant negative feedback it had received from the FDA about the flawed structure of the Lemtrada trials. The

Defendants intended to, and did, deceive the investing public, including Whitebox, and artificially inflate the prices of the CVRs, causing Whitebox to purchase and acquire the CVRs at artificially inflated prices.

99.   The Defendants were individually and collectively responsible for making the material misrepresentations and omissions and engaging in a plan, scheme, and course of conduct designed to deceive Whitebox and other Sanofi investors, by virtue of having prepared, approved, signed, and disseminated documents that contained untrue statements of material fact and omitted facts necessary to make the statements therein not misleading.

100.   As set forth above, the Defendants made their false and misleading statements and omissions and engaged in deceptive conduct knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Whitebox.

101.   In ignorance of the false and misleading nature of the Defendants' statements and omissions, and relying on those statements, Whitebox purchased or acquired the CVRs at artificially inflated prices. When the true facts were subsequently disclosed, the prices of the CVRs declined, and Whitebox were harmed as a result.

**COUNT EIGHT**
Mass. Gen. L. Ch. 110A §§ 101 to 417
Against All Defendants

102.   The preceding paragraphs of the Complaint are incorporated as if stated fully herein.

103.   As alleged herein, Defendants made untrue statements of material fact and omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme, and course of conduct in violation of Mass. Gen. L. Ch. 110A §§ 410(a)(2) & 410(b). In particular, each of Sanofi and Genzyme's statements about the results from its Lemtrada trials and prospects for FDA approval were made misleading by its failure to disclose the significant negative feedback it had received from the FDA about the flawed structure of the Lemtrada trials. The Defendants intended to, and did, deceive the investing public, including the Sapelo Funds, and artificially inflate the prices of the CVRs, causing Plaintiffs to purchase and acquire the CVRs at artificially inflated prices.

104.   The Defendants were individually and collectively responsible for making the material misrepresentations and omissions and engaging in a plan, scheme, and course of conduct designed to deceive the Sapelo Funds and other Sanofi investors, by virtue of having prepared, approved, signed, and disseminated documents that contained untrue statements of material fact and omitted facts necessary to make the statements therein not misleading.

105.   As set forth above, the Defendants made their false and misleading statements and omissions and engaged in deceptive conduct knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon the Sapelo Funds.

106.   In ignorance of the false and misleading nature of the Defendants' statements and omissions, and relying on those statements, the Sapelo Funds

purchased or acquired the CVRs at artificially inflated prices. When the true facts were subsequently disclosed, the prices of the CVRs declined, and the Sapelo Funds were harmed as a result.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request an Order and Judgment from the Court as follows:

      1.     Determining that Defendants have violated Sections 11 and 12(2) of the '33 Act, Sections 10(b), 18, and 20(a) of the '34 Act, Cal. Corp. Code §§ 25401, 25504, Minn. Stat. § 80A.76, and Mass. Gen. L. Ch. 110A §§ 101 to 417 and awarding Plaintiffs compensatory damages, rescission, or rescissory damages in an amount to be determined at trial, including pre-judgment interest, attorneys' fees, and costs; and

      2.     Granting Plaintiffs such further and other relief as the Court deems just and necessary.

Dated: March 28, 2014

ROSS & ORENSTEIN LLC

Jeff Ross
John Orenstein
Harry Niska
222 South Ninth Street, Suite 470
Minneapolis, MN 55402
Telephone: (612) 436-9800

**ATTORNEYS FOR PLAINTIFFS**